**William S. WHYTE II, M.D., Plaintiff,**

v.

**AMERICAN BOARD OF PHYSICAL MEDICINE AND REHABILITATION, a Minnesota Nonprofit Corporation; and Anthony M. Tarvestad, Defendants.**

No. Civ.03–5552 PAM/RLE.

United States District Court,
D. Minnesota.

April 4, 2005.

Timothy D. Kelly, Kelly & Berens, Minneapolis, MN, Kent Masterson Brown, Christopher J. Shaughnessy, Law Offices

of Kent Masterson Brown, Lexington, KY, for Plaintiff.

William R. Stoeri, Gina L. Cesaretti, Dorsey & Whitney, Minneapolis, MN, for Defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court on cross-Motions for Summary Judgment. For the reasons that follow, the Court denies Plaintiff's Motion and grants Defendants' Motion.

## BACKGROUND

Plaintiff William Whyte is a physician specializing in physical medicine and rehabilitation. He is licensed to practice medicine in the State of Louisiana. Although he holds no hospital medical staff privileges, Whyte currently has a private practice in Shreveport, Louisiana. His practice earned over $660,000 in profits in 2002 and over $841,000 in 2003.

Defendant American Board of Physical Medicine and Rehabilitation ("ABPMR"), a nonprofit Minnesota corporation, is a national certification board for physicians in the medical speciality of physical medicine and rehabilitation. Although certification is not a prerequisite to practice physical medicine and rehabilitation, ABPMR is the only organization in the United States that offers board certification in that specialty. ABPMR establishes the requirements for board certification, and administers written and oral examinations to physicians who meet the requisite educational and training requirements. Defendant Anthony Tarvestad is the Executive Director of ABPMR.

### A. ABPMR Certification

To attain ABPMR certification, a physician must graduate from an approved medical school, possess a valid medical license, satisfactorily complete residency and training requirements, and comply with ABPMR rules and regulations pertaining to the application for examination. In addition, the physician must successfully complete written and oral board certification examinations.

Whyte applied for ABPMR certification in September 1999 by completing and signing an ABPMR examination and certification application. That application includes waiver and indemnity provisions, which state:

> I understand and agree that the decision as to whether my grades and other performances on the Board's examination qualify me for a certification of qualification rests solely and exclusively in the Board, and that its decision is final.
>
> I waive and release and shall indemnify the Board and its directors, members, officers, committee members, employees, and agents from, against and with respect to any and all claims, losses, costs, expenses, damages, and judgments (including reasonable attorneys fees) alleged to have arisen from, out of, with respect to or in connection with any action which they, or any of them, take or fail to take as a result of or in connection with this application, any examination conducted by the Board which I apply to take or take, the grade or grades given me on the examination and, if applicable, the failure of the Board to issue me a certificate or qualification of the Board's revocation of any certificate or qualification previously issued to me.

(Jan. 31, 2005, Burfeind Aff. Ex. 5.) The application also states that unsigned or altered forms will not be accepted. (*Id.*)

Upon review of his application, ABPMR determined that Whyte qualified to take the written certification examination, which he took in May 2000. In June 2000, Whyte received a letter from Tarvestad, which advised Whyte that he had passed

the written certification examination and explained what procedures Whyte needed to complete to take the oral examination.[1] Enclosed with the letter was a candidate score report, which detailed how Whyte performed on the written examination. The dispute in this case involves the candidate score report. Whyte claims that he received a score report that identified his total scaled score as 706 and his percentile rank as 99.6. However, the score report maintained by ABPMR offices shows that Whyte received a total scaled score of 465 and a percentile rank of 47.1.

Whyte sat for the oral examination in May 2001, but failed the examination.

## B. Whyte's Application to Willis–Knighton Medical Center

In July 2001, Whyte submitted an application for medical staff privileges to Willis–Knighton Medical Center in Shreveport, Louisiana. As part of the application process, Whyte submitted his *curriculum vitae*, which stated that Whyte had scored in the 99.6 percentile on the ABPMR written examination, and further claimed that his score was the third highest in the nation.[2]

After reviewing Whyte's application, the Medical Staff Director of Willis–Knighton attempted to verify whether Whyte was board certified by querying the American Board of Medical Specialties' website. When the website indicated that Whyte was not certified, the Director informed Whyte that she needed to obtain verification from ABPMR about Whyte's certification status.

To expedite the credentialing process, Whyte provided Willis–Knighton with a copy of the letter and score report he allegedly received from ABPMR in June 2000. After receiving the score report and letter, the Director contacted ABPMR to verify that Whyte had scored in the 99.6 percentile on the written examination. On August 16, 2001, Tarvestad responded by confirming that Whyte had passed the written examination, but did not specify Whyte's ranking.

The next day, the Director inquired again about Whyte's examination score. She explained that Willis–Knighton had discovered several discrepancies in Whyte's application and asked that ABPMR confirm Whyte's score. The Director also attached a copy of the score report Whyte had submitted to Willis–Knighton. After comparing the score report Whyte provided to Willis–Knighton to the score report maintained at ABPMR offices, Tarvestad informed Willis–Knighton that the score report "is not a copy of the official score report on file with our office." (Cesaretti Aff. Ex. A (Tarvestad Dep.) at Ex. 24.) He further stated that the score report provided by Whyte "contained several discrepancies from the official ABPMR score report." (*Id.*) Neither Tarvestad nor any other ABPMR staff member had further contact with Willis–Knighton.

After receiving a copy of the score report Whyte submitted to Willis–Knighton, Tarvestad notified Whyte of the discrepancy between the reports. Tarvestad also requested that Whyte advise ABPMR in writing "of the circumstances surrounding

1. To qualify for the oral examination, an applicant must successfully complete the written examination.

2. Except for naming the top scoring candidate, ABPMR does not provide candidates with exam score rank information. Accordingly, Whyte acknowledges that ABPMR never informed him that he had achieved the third highest score. Instead, Whyte surmised his alleged rank after talking with a group of fellow candidates at the ABPMR oral examinations in May 2001. Whyte never attempted to verify this information with ABPMR.

the score report submitted to Willis–Knighton Health System." (*Id.* at Ex. 23.) On August 28, 2001, Tarvestad sent another letter to Whyte, stating:

> [I]t has come to the Board's attention that you have supplied a score report to Willis–Knighton Health System indicating a scaled score of 706 and a percentile rank of 99.6 … According to the records of the Board, your scaled score was 465 and your percentile rank was 47.1. Before the Board considers what action, if any, to take about this matter, we would like to provide you with an opportunity to explain the circumstances concerning the existence of the enclosed score report. Please provide your response on or before September 15, 2001.

(*Id.* at Ex. 27.) Whyte responded that the score report he provided to Willis–Knighton was the same one he had received from ABPMR.

In the meantime, ABPMR staff conducted an internal investigation into the discrepancy. The staff determined that no one had achieved a scaled score of 706 or a 99.6 percentile ranking for the May 2000 written examination. In addition, the staff confirmed that all score reports were generated from one data file, and that a score report sent to Whyte's program director showed that Whyte received a scaled score of 465 and a 47.1 percentile ranking. Finally, the staff compared the two score reports and concluded that the score report submitted to Willis–Knighton had different margin justifications, column spacing, and numerical formats than the reports generated by the ABPMR computer program. Based on these findings, the staff surmised that the score report Whyte submitted to Willis–Knighton was not the score report that ABPMR had sent to him.

## C. ABPMR Disciplinary Policies and Procedures

ABPMR disciplinary policies and procedures state that ABPMR may penalize applicants who falsify or misrepresent their examination status or scores. According to the procedures, such matters are referred to the ABPMR Credentials Committee, who is charged with obtaining available information and determining whether the matter warrants further review. If the Credentials Committee decides that further review is warranted, it must advise the applicant in writing of the matters at issue.[3] The applicant then has thirty days to submit a written response. The Credentials Committee must then consider all available information, including the information formally submitted by the applicant. After reviewing the information, the Credentials Committee must recommend to the ABPMR Board of Directors whether sanctions are appropriate.

The Board of Directors will then inform the applicant of the recommendation and provide the applicant thirty days to submit new, relevant written information. Following the final decision by the Board of Directors, the applicant will receive written notification of its decision. The decision is final and binding on the applicant.

## D. ABPMR Action against Whyte

Whyte's alleged misrepresentation of his scores was referred to the ABPMR Credentials Committee. On January 24, 2002, the Committee examined the disparate score reports, the correspondence from Willis–Knighton and Whyte, and the memoranda summarizing the ABPMR staff's findings. Based on this information, the Committee determined that the matter warranted further review. It also recom-

---

**3.** A booklet of information issued by ABPMR also provides that the candidate must receive written notice of the charges and an opportunity to respond in accordance with the appeals procedures set forth in the ABPMR rules and regulations.

mended that the Board of Directors invalidate Whyte's written examination, indefinitely bar Whyte from sitting for future exams, and report the matter to the appropriate state medical board.

On January 28, 2002, the Board of Directors reviewed the recommendation of the Committee, and adopted the recommendation with one exception: the Board concluded that a permanent bar from sitting for future exams was more appropriate. The Board of Directors then directed Tarvestad to notify Whyte of the recommended sanctions and provide him thirty days to respond.

On January 31, 2002, Tarvestad invited Whyte to submit additional, relevant information. In response, Whyte and his wife submitted affidavits, stating that the score report submitted to Willis–Knighton was the same score report that Whyte received in June 2000 from ABPMR. After considering the affidavits, the Committee made its final recommendation to the Board of Directors.

The Board of Directors reviewed the final recommendation on May 17, 2002. Ultimately, the Board of Directors decided to invalidate Whyte's written certification test score and indefinitely bar him from seeking ABPMR certification.[4] It also sent a letter, which chronicled the events that had transpired, to the Louisiana Board of Medical Examiners. The letter enclosed copies of all correspondence relating to the matter, as well as the affidavits submitted by Whyte. (Jan. 31.2005, Burfeind Aff. Ex. 37.) The Louisiana Board of Medical Examiners determined that it would not revoke Whyte's license.

Whyte commenced this action in October 2003. He asserts five claims: (1) a due process claim, alleging arbitrary and capricious exclusion from medical society; (2) defamation; (3) tortious interference with prospective advantage; (4) breach of contract; and (5) breach of implied covenant of good faith and fair dealing. Whyte now moves for partial summary judgment on the due process claim, seeking a declaration that the actions of ABPMR were arbitrary and capricious. Whyte also seeks a permanent injunction ordering ABPMR to recognize and reinstate his written examination score and to allow him to retake the oral examination.

ABPMR counterclaimed, alleging breach of contract and seeking indemnification for all of the losses incurred as a result of this lawsuit. Defendants seek summary judgment on all counts in the Complaint, as well as on the Counterclaim.

## DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of

4. The Board of Directors subsequently limited the duration of Whyte's suspension to eight years from the time of the sanctioned conduct. Thus, Whyte may seek board certification in July 2009.

material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Exculpatory Clause in Application

By applying for board certification, Whyte agreed to waive and release all claims against ABPMR. At issue is whether the waiver and release provision is enforceable.

 Although Minnesota law recognizes the validity of exculpatory clauses, such clauses are generally disfavored. Thus, courts strictly construe exculpatory clauses against the party who benefits from the clause. *Beehner v. Cragun Corp.*, 636 N.W.2d 821, 827 (Minn.App. 2001). When determining whether an exculpatory clause is valid, courts consider factors such as whether the exculpatory clause language is ambiguous, whether adequate consideration supports the release, and whether the release violates public policy. *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 541 (8th Cir.1987); *Spitzmueller v. Burlington N. Railroad*

*Co.*, 740 F.Supp. 671, 676 (D.Minn.1990) (Rosenbaum, J.); *Beehner*, 636 N.W.2d at 827.

 In this case, the parties dispute whether the release violates public policy.[5] Whyte argues that the release is part of a contract of adhesion and therefore violates public policy.[6] When determining whether an exculpatory clause violates public policy, the Court must consider two factors:

(1) whether there was a disparity of bargaining power between the parties (in terms of a compulsion to sign a contract containing an unacceptable provision and the lack of ability to negotiate elimination of the unacceptable provision) and (2) the types of services being offered or provided (taking into consideration whether it is a public or essential service).

*Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn.1982) (internal citations omitted).

 Whyte contends that he was forced to sign the application and was unable to negotiate the exclusion of the boilerplate release from the application terms. He also submits that ABPMR is the only organization in the United States that offers board certification in the specialty of physical medicine and rehabilitation, and therefore wielded unequal bargaining power

5. The parties agree that the release provision is clear and unequivocal, as it specifically purports to exonerate ABPMR from liability for all claims in connection with Whyte's application, his exam scores, and a failure to issue a certification. Indeed, Whyte admits that he read and understood the terms of the release provision.

Likewise, the parties agree that adequate consideration was provided to support the release. Adequate consideration "is manifest in the administration and review of the written" exam. *Balaklaw v. Am. Bd. of Anesthesiology, Inc.*, 149 Misc.2d 11, 562 N.Y.S.2d 360, 362 (1990); *see also Malecha v. St. Croix*

*Valley Skydiving Club, Inc.*, 392 N.W.2d 727, 731 (1986) (exculpatory agreement supported by adequate consideration when plaintiff paid a training course fee and waived his right to sue).

6. An adhesion contract "is drafted unilaterally by a business enterprise and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere. It is a contract generally not bargained for, but which is imposed on the public for necessary service on a 'take it or leave it' basis." *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 925 (Minn.1982) (internal citations omitted).

over Whyte. Finally, he maintains that the specialty certification is a sine qua non of Whyte being able to obtain hospital medical staff privileges and is therefore a practical necessity.

The Court is not persuaded by Whyte's arguments for several reasons. First, proof that Whyte had no opportunity to negotiate the terms of an exculpatory agreement is not enough to show a disparity of bargaining power. *Beehner*, 636 N.W.2d at 828. Moreover, it is undisputed that Whyte fully understood the application terms and never even attempted to negotiate a modification of those terms. Second, Whyte voluntarily chose to apply for board certification. He presents no evidence of compulsion, exploitation, ultimatums, or deadlines for acceptance. Finally and most significantly, Whyte presents no evidence that board certification is a practical necessity for his livelihood. While certification would likely enhance Whyte's career, it is not required to practice physical medicine and rehabilitation. Indeed, Whyte earned over $600,000 annually while practicing physical medicine and rehabilitation without board certification.

On this point, this case is significantly different than *Bunia v. Knight Ridder*, 544 N.W.2d 60 (Minn.Ct.App.1996) and *Walton v. Fujita Tourist Enters. Co.*, 380 N.W.2d 198 (1986), cases on which Whyte relies. In both of those cases, the Minnesota Court of Appeals relied heavily on the fact that the disparity of bargaining power arose because the plaintiffs were forced to agree to the releases in order to sustain their livelihood.

Conversely, Whyte has failed to show that certification is a necessary component of his livelihood. Moreover, the release provision in this case promotes public poli-cy that is absent from consideration in cases like *Bunia* and *Walton*.[7] The exculpatory clause here allows ABPMR, a private organization that establishes the rules of application and membership, to insist that applicants agree to a legal cease-fire. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 249 (7th Cir.1994).

Finally, the Court is persuaded by *Sanjuan* and several other decisions that have upheld release provisions that bar medical professionals from suing a certifying board because of actions taken by the board during the certification process. In each instance, the plaintiff had signed a waiver provision similar to the provision in Whyte's application. Each court granted summary judgment to the certification board, finding that the waiver provisions were valid and enforceable. *See Sanjuan*, 40 F.3d at 249; *Balaklaw*, 562 N.Y.S.2d at 361–63; *Am. Registry of Radiological Techs. v. McClellan*, No. 300CV2577K, 2003 WL 22171702 (N.D.Tex. Mar. 5, 2003).

■■ In this case, the undisputed record shows that the waiver provision was not the result of a disparity in bargaining power and that certification is not necessary for Whyte's livelihood. Thus, the provision is enforceable as consistent with public policy. It therefore bars Whyte's due process, breach of contract, and breach of implied covenant claims. However, because a party cannot contractually limit its liability for intentional acts, the waiver provision cannot preclude Whyte from pursuing his intentional tort claims of defamation and tortious interference. *See Honeywell, Inc. v. Ruby Tuesday, Inc.*, 43

---

7. Both *Bunia* and *Walton* involved personal injury cases grounded in negligence. Public policy discourages the enforcement of exculpatory clauses that attempt to insulate from liability for unexpected bodily harm. Notably, that policy concern is absent from this case.

F.Supp.2d 1074, 1080 (D.Minn.1999) (Doty, J.).

## C. Defamation

Whyte alleges that Defendants published defamatory statements to Willis–Knighton and the Louisiana Board of Medical Examiners. To establish a defamation claim, Whyte must show that Defendants published a false statement about Whyte that harmed his reputation. *Minnwest Bank Cent. v. Flagship Prop.*, 689 N.W.2d 295, 301 (Minn.App.2004).

### 1. *Statements to Willis–Knighton*

The claim based on communications with Willis–Knighton fails because it is barred by the statute of limitations. A defamation action must be commenced within two years of a plaintiff's discovery of the allegedly defamatory publication. *See* Minn. Stat. § 541.07. Whyte commenced this action in October 2003. The last communication between ABPMR and Willis–Knighton occurred on August 21, 2001. Whyte was aware of the communications on August 28, 2001, when Tarvestad informed him of the discrepancy in score reports. Thus, Whyte's claim based on communications to Willis–Knighton is untimely and therefore fails as a matter of law.

### 2. *Statements to the Louisiana Board of Medical Examiners*

 Whyte also claims that Defendants defamed him by sending a letter to the Louisiana Board of Medical Examiners. Although Whyte concedes that no statement in the letter is defamatory on its face, he contends that the statements imply that Whyte knowingly misrepresented his credentials to Willis–Knighton. Minnesota law recognizes a defamation claim based on innuendo. *See Carter v. Peace Officers Standards & Training Bd.*, 558 N.W.2d 267, 273 (Minn.App.1997) ("Defamatory statements may include statements that are arguably true, but

made under circumstances to mislead and confuse the listener and place the target in a false and negative light"); *see also Michaelis v. CBS, Inc.*, 119 F.3d 697, 700 (8th Cir.1997) (in determining whether a particular statement is defamatory, the court must review the statement in the context in which it was presented and consider the innuendos which follow from the statement). The Court must determine whether an allegedly defamatory innuendo is reasonably conveyed by the language used. *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 307–08 (Minn.App.2001).

 Construing the letter in a light most favorable to Whyte, the Court finds that one could conclude that the letter implies that Whyte knowingly submitted a false score report to Willis–Knighton. Although Whyte bears the ultimate burden of proving that he did not misrepresent his examination score, a factual dispute now exists on that issue.

 Nevertheless, the Court finds that the statements to the Louisiana Board of Medical Examiners are protected by qualified privilege. "A qualified privilege is applied as a matter of law, in certain contexts when a candid statement is encouraged." *Minnwest Bank Central*, 689 N.W.2d at 301. A qualified privilege applies if a statement is made in good faith, for a proper reason, and is based on reasonable or probable cause. *Id.*

Qualified privilege applies in this context. As a certifying board, ABPMR is obligated to verify the status of physicians claiming board certification. Moreover, ABPMR has a professional duty to report any misconduct to those with a legitimate interest, including licensing agencies. ABPMR provided the information to the Louisiana Board of Medical Examiners, an appropriate professional entity, on a proper occasion and after ABPMR had taken

reasonable steps to assure the veracity of the information.

■ Whyte contends that the letter was not based on reasonable cause. "Reasonable grounds can exist if a person has valid reasons for believing a statement, even though the statement later proves to be false." *Rudebeck v. Paulson*, 612 N.W.2d 450, 454 (Minn.App.2000) (quoting *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 55 (Minn.App.1995)). When determining whether the statements were supported by reasonable cause, the Court examines whether ABPMR properly investigated the matter to ascertain the accuracy of the statements made in the letter. *Id.* In this case, ABPMR sufficiently investigated the issue and provided Whyte two opportunities to explain how the discrepancy occurred. Moreover, ABPMR presented both sides of the story to the Louisiana Board of Medical Examiners. Under these circumstances, the Court finds that the statements were privileged as a matter of law. *See id.* (qualified privilege applies when employer investigated sexual harassment allegations by interviewing plaintiff and other key witnesses); *see also Bol v. Cole*, 561 N.W.2d 143, 149–50 (Minn.1997) (psychologist had reasonable belief that statements in a child abuse report were true based on interview with alleged victim).

■ Because Defendants are entitled to a qualified privilege, Whyte must prove that they abused the privilege by acting with actual malice. *Minnwest Bank Cent.*, 689 N.W.2d at 301. "Malice cannot be inferred from a dispassionate statement based on reasonable information." *Id.* Rather, Whyte must show that the statement is based on ill will, improper motive, or an intent to injure him without cause. *Id.* On a summary judgment mo-

tion, a claim of malice will not defeat a qualified privilege in the absence of some facts demonstrating the animosity of the adverse party. *Id.* The record is completely devoid of any evidence demonstrating that transmission of the letter to the Louisiana Board of Examiners was motivated by ill will or improper motive. Indeed, the letter fairly presents both sides of the situation. Because Whyte fails to raise a genuine issue of material fact regarding malice, summary judgment is proper.[8]

### D. Tortious Interference with Prospective Advantage

■ Whyte claims that Defendants' communications with Willis–Knighton and his subsequent suspension from seeking board certification impaired Whyte's relationship with Willis–Knighton and further limited his legitimate expectancy of economic gain. Tortious interference with business or contractual relationships can involve either present or prospective relations. *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632 (Minn.1982). To establish a tortious interference claim, Whyte must show that he had an actual or prospective contractual relationship, that Defendants intentionally and wrongfully interfered with the prospective relationship, and that he suffered damages as result of the interference. *Id.* at 633.

■ Whyte's claim fails for two reasons. First, Whyte presents no evidence that Defendants' conduct was improper or unjustified under the circumstances. As a certifying board, ABPMR must verify the status of physicians claiming board certification. Indeed, Willis–Knighton solicited ABPMR to provide information on Whyte's examination scores. Thus,

---

8. Furthermore, Whyte's claim fails because he has failed to show that the letter to the Louisiana Board of Medical Examiners injured his reputation since the Board took no action as a result of ABPMR's disclosure.

ABPMR's disclosures to Willis–Knighton were justified. *Glass Serv. Co., v. State Farm Mut. Auto. Ins. Co.,* 530 N.W.2d 867, 871 (Minn.App.1995) (defendant was justified in informing insured of policy limits and suggesting alternative vendors when plaintiff's prices exceeded prevailing competitive price); *Lehn v. Kolles,* No. A03–1602, 2004 WL 1049201, at *2–3 (Minn.App. May 11, 2004) (because defendant had duty to inquire about unclear terms, plaintiff failed to show improper conduct).

■ Second, the evidence does not indicate that Defendants' conduct was the proximate cause of Whyte's claimed damages. Whyte withdrew his application for medical staff privileges with Willis–Knighton before ABPMR made an official determination relating to the score report discrepancy. Moreover, Willis Knighton had already identified several discrepancies with Whyte's application. Consequently, Whyte has failed to present any evidence suggesting that he would have been granted privileges but for Defendants' conduct.

### E. Breach of Contract Counterclaim

■ ABPMR seeks summary judgment on its counterclaim alleging breach of contract and seeking indemnification for all of the losses incurred as a result of this action. Contract principles apply to the interpretation of an indemnity agreement. *Buchwald v. Univ. of Minn.,* 573 N.W.2d 723, 726 (Minn.Ct.App.1998). When construing an unambiguous agreement, the Court must give the contract language its plain and ordinary meaning. *Id.*

■ Whyte signed and submitted an application that specifically required Whyte to indemnify ABPMR for "any and all claims, losses, costs, expenses, damages, and judgments (including reasonable attorneys fees)" relating to his application and board certification examination. This language conveys the clear intent that ABPMR receive indemnification for all litigation costs incurred as a result of application and examination disputes. All of the claims alleged in the Complaint arose from ABPMR's actions relating to Whyte's application and examination. Thus, Whyte is required to indemnify ABPMR for costs and expenses incurred by ABPMR in defending this action, including reasonable attorneys' fees.

### CONCLUSION

For the foregoing reasons, and upon all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendants' Motion for Summary Judgment (Clerk Doc. No. 10) is GRANTED; and

2. Plaintiff's Motion for Partial Summary Judgment (Clerk Doc. No. 13) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**